UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Consumer Financial Protection Bureau,

　　　Plaintiff,

　　v.                                                    No. 1:13-cv-13167 (GAO)

CashCall, Inc., WS Funding, LLC, Delbert
Services Corporation, and J. Paul Reddam,

　　　Defendants.

## FIRST AMENDED COMPLAINT

### Introduction

The Consumer Financial Protection Bureau brings this action against

Defendants CashCall, Inc., WS Funding, LLC, Delbert Services Corporation, and J.

Paul Reddam under the Consumer Financial Protection Act of 2010 (CFPA),

12 U.S.C. §§ 5531(a), 5536(a), 5564(a). Defendants purchased, serviced, and collected

consumer-installment loans that state laws rendered void or limited the consumer's

obligation to repay. As a result, Defendants took money from consumers that those

consumers did not owe and typically could ill-afford to lose.

1

## Jurisdiction and Venue

1.   This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.   The Court has personal jurisdiction over Defendants because the causes of action arise from Defendants' transacting business in this commonwealth, contracting to supply services in this commonwealth, or causing tortious injury in this commonwealth by an act or omission outside this commonwealth.

3.   Venue is proper in this District because a substantial part of events or omissions giving rise to the claims occurred here and Defendants do business here. 28 U.S.C. § 1391(b)(2); 12 U.S.C. § 5564(f).

## Parties

4.   The Bureau is an agency of the United States, 12 U.S.C. § 5491(a), and has independent litigating authority. 12 U.S.C. § 5564(a)-(b).

5.   CashCall, Inc. is a California corporation, with its principal place of business at 1600 S. Douglass Road, Anaheim, CA 92806. As a significant part of its business, CashCall services and collects consumer-installment loans. Those activities are "consumer financial services" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(i), 15(A)(x). CashCall is therefore a "covered person." 12 U.S.C. § 5481(6).

6.   WS Funding, LLC is a wholly owned subsidiary of CashCall. As a significant part of its business, WS Funding purchases consumer-installment loans. That activity is a "consumer financial service" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(i). WS Funding is therefore a "covered person." 12 U.S.C. § 5481(6).

7.   Delbert Services Corporation is a Nevada corporation, with its principal place of business at 7125 Pollock Dr., Las Vegas, NV 89119. Delbert applied for, obtained, and currently has a license to engage in the business of debt collection in several states, including in the Commonwealth of Massachusetts. As a significant part of its business, Delbert acquires, services, and collects consumer-installment loans. Those activities are "consumer financial services" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(i), 15(A)(x). Delbert is therefore a "covered person." 12 U.S.C. § 5481(6).

8.   J. Paul Reddam is the CEO, president, sole director, and sole owner of CashCall; the president, manager, sole member, and sole owner of WS Funding; and the director and sole owner of Delbert. He has managerial responsibility for CashCall, WS Funding, and Delbert, and has materially participated in the conduct of their affairs. Reddam is therefore a "related person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i)-(ii). Because Reddam is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B).

**State Laws Protecting Consumers Who Take Out Small-Dollar Loans**

9.   Many states have enacted laws that govern the terms of small-dollar consumer loans, including laws that restrict which entities may engage in these transactions, require lenders to be licensed or otherwise subject to state regulation, and impose civil and criminal usury limits.

10.  Those laws reflect the states' strong public policies that loans breaching those restrictions pose significant harm to state residents.

*Interest-Rate Caps*

11.  To deter violations of such laws and redress consumer harm, several states have adopted laws that render small-dollar loans void if they exceed the usury limit. If a lender makes a covered loan that exceeds the usury limit in these states, the lender has no legal right to collect money from consumers in repayment of the loan. These states include:

    a.   **Arkansas**, whose state constitution provides that all contracts with interest above 17% "shall be void as to principal and interest." Ark. Const. amend. 89, §§ 3, 6(b);

    b.   **Minnesota,** which caps interest rates for (a) written loan contracts at 8% absent applicability of another statute, Minn. Stat. § 334.01, subdiv. 1; and (b) consumer short-term loans at 21.75% APR, or the total of 33% a year on the part of the unpaid balance up to $1,125 and 19% a

4

year on the part of the unpaid balance above $1,125, Minn. Stat.

§ 47.59, subdiv. 3(a). Loans that exceed these rates are void and the

borrower has no obligation to pay any amounts owing on them. Minn.

Stat. §§ 334.03, 47.601, subdiv. 6(b);

c. **New Hampshire**, which prohibits annual interest rates above 36% for

loans of $10,000 or less. N.H. Rev. Stat. § 399-A:12(I). Loans that do not

comply with those restrictions are void, and the lender has no right to

collect any principal, charges, or recompense. N.H. Rev. Stat. § 399-

A:11(V);

d. **New York**, which prohibits any person or corporation not licensed by

the state of New York from "directly or indirectly, charg[ing], tak[ing] or

receiv[ing] any . . . interest . . . at a rate exceeding" annual interest of

16% on covered loans. N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking

Law § 14-a(1). Loans that exceed the rate are void. N.Y. Gen. Oblig.

Law § 5-511; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y.

1986) ("[A] usurious transaction is void *ab initio* . . . ."); and

e. **North Carolina**, which imposes a tiered set of interest-rate limits with a

maximum of 30% on loans below $15,000 and repayable between 12 and

96 months. N.C. Gen. Stat. § 53-176(a). Loans that violate this provision

are void, and the lender has no right to collect, receive, or retain any principal or charges. N.C. Gen. Stat. § 53-166(d).

12.  Additionally, **Colorado** prohibits annual interest above 12% on unpaid balances for loans other than supervised loans. Colo. Rev. Stat. § 5-2-201(1). For supervised loans, Colorado prohibits a supervised lender from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1,000.01 and $3,000, and 15% on unpaid balances greater than $3,000; or (b) 21% a year on unpaid balances. Colo. Rev. Stat. § 5-2-201(2). Consumers are relieved of the obligation to pay any charge that exceeds these limits, and are entitled to a refund from the lender or assignee for any excess amount that they paid. Colo. Rev. Stat. § 5-5-201(2).

*Licensing Requirements*

13.  Many states, including Alabama, Arizona, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio, also have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer-lending practices. Those state-licensing regimes reflect substantive consumer-protection concerns by, for instance:

a. ensuring that licensees possess the requisite character, fitness, financial responsibility, or experience (Ala. Code § 5-18-6(b), Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); 205 ILCS 670/4; Ind. Code § 24-4.5-3-503(2); Ky. Rev. Stat. Ann. § 286.4-450(1); 209 Mass. Code Regs. 20.03(2); Minn. Stat. Ann. § 56.04; Mont. Code Ann. § 32-5-202; N.H. Rev. Stat. § 399-A:4(I); N.J. Rev. Stat. § 17:11C-7(c); N.M. Stat. Ann. § 58-15-5(F); N.Y. Banking Law § 342; N.C. Gen. Stat. § 53-168(a)(2); Ohio Rev. Code Ann. § 1321.04(A)); and

b. ensuring compliance with loan-term and disclosure regulations by providing for compliance oversight by state regulators and requiring recordkeeping and annual reports (Ala. Code §§ 5-18-10, 5-18-11; Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-609(A)-(D); Colo. Rev. Stat §§ 5-2-304, 5-2-305; 205 ILCS 670/10-11; Ind. Code § 24-4.5-3-505; Ky. Rev. Stat. Ann. §§ 286.4-590, 286.4-600, 286.4-610; Mass. Gen. Laws ch. 140, §§ 97-99; Minn. Stat. §§ 47.601, subdiv. 4, 45.027, subdiv. 1, 56.10, subdiv. 1; Mont. Code Ann. §§ 32-5-307, 32-5-308, 32-5-402, 32-5-403; N.H. Rev. Stat. §§ 399-A:6, 399-A:10; N.J. Rev. Stat. §§ 17:11C-18, C-19, C-42, C-43; N.M. Stat. Ann. §§ 58-15-9, 58-15-10, 58-15-10.1; N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. §§ 53-184; Ohio Rev. Code Ann. §§ 1321.07, 1321.09).

14.  These state-licensing statutes reflect the states' strong public policy that entities seeking to engage in the consumer-lending business with state residents must be vetted and subject to oversight by regulators to ensure that they adhere to consumer-protection and other laws.

15.  To incentivize licensure and redress consumer harm, several states have adopted laws that render small-dollar loans void if they are made without a license. If a covered loan is made without a license in these states, the entity has no right to collect from consumers, or the consumers have no obligation to pay money in repayment of the loan. These states include the following:

    a.  **Alabama**, which voids covered loans of $1,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, Ala. Code §§ 5-18-4(a), (d);

    b.  **Arizona**, which voids covered loans of $10,000 or less that are made or procured without a license, and the lender has no right to collect any principal, finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B);

    c.  **Illinois**, which voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013 without a license, and the person who made the loan shall have no right to collect, receive, or

8

retain any principal, interest, or charges related to the loan, 205 ILCS 670/1, 670/20(d);

d. **Indiana**, which voids covered loans in which the finance charge exceeds 25% a year that are made without a license, and the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-5-202, 24-4.5-3-502(3);

e. **Kentucky**, which voids covered loans of $15,000 or less if the interest rate exceeds 8% and the loan is made without a license, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1);

f. **Massachusetts**, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% a year and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Law. ch. 140, §§ 96, 110;

g. **Minnesota**, which voids covered loans of $1,000 or less that are made without a license, and the borrower is not obligated to pay any amounts owing on such loans, Minn. Stat. §§ 47.601, subdiv. 1(d), subdiv. 6(b)(1);

h. **Montana**, which voids covered loans in any amount that are made, or for which any compensation is contracted for, charged, or received directly or indirectly, by a person without a license, and the person does not have the right to collect, receive, or retain any principal, interest, fees, or other charges on such loans, Mont. Code Ann. § 32-5-103(1), (4);

i. **New Hampshire**, which voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XIV), 399-A:2(I), (IV);

j. **New Jersey**, which voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

k. **New Mexico**, which voids loans of $2,500 or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. Ann. § 58-15-3;

l. **New York**, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that

permitted to a licensee, and the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

m. **North Carolina**, which voids covered loans of $15,000 or less that are made or secured for repayment without a license, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat.§ 53-166(a), (d); and

n. **Ohio**, which voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02.

16.  Additionally, in **Colorado**, a lender's or assignee's failure to obtain the requisite license removes the consumer's obligation to pay finance charges to the lender or assignee. Colo. Rev. Stat. §§ 5-5-201(1), 5-2-301(1)(a), (b), 5-1-301(17).

17.  Even where the statutory prohibition on collecting a void consumer loan does not explicitly extend to a purchaser or assignee of the loan, the assignee or purchaser will stand in the shoes of the lender, and, except under limited circumstances, will likewise have no legal right to collect the void loan.

*Impact of Violations of Interest-Rate Caps and Licensing Requirements*

18.  Thus, in the following states – Alabama, Arkansas, Arizona, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire,

New Jersey, New Mexico, New York, North Carolina, and Ohio (collectively, the Subject States) – a violation of usury limits or the failure to comply with licensing requirements will render a small-dollar loan void or will limit the consumer's obligation to repay the loan. Those violations impact both the legal status of the loan and the parties' underlying rights and obligations, with the effect of vitiating both (1) the rights of the lender or the subsequent purchaser or assignee to collect all or part of the loan, and (2) the obligations of the consumer to repay all or part of the loan to the lender or to any subsequent purchaser or assignee.

### Small-Dollar Loans Made to Consumers in the Subject States

*Description of the Loans*

19. Western Sky Financial, LLC is an online lender. It is owned by a member of the Cheyenne River Sioux Indian Reservation, but is not owned or operated by a tribe or tribal entity. Western Sky is a limited-liability company organized under South Dakota law. It purports that loans made in its name are subject only to the laws of the Cheyenne River Sioux Indian Reservation.

20. Beginning in late 2009, CashCall and its wholly owned subsidiary, WS Funding, entered into a series of agreements with Western Sky to secure high-cost, consumer-installment loans that – purportedly – did not have to comply with state law (WS Loans).

21.  Under these agreements, WS Loans were made in Western Sky's name, but were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall, Delbert, or both.

22.  Between early 2010 and late 2013, hundreds of thousands of WS Loans were made to consumers nationwide, including to consumers in the Subject States.

23.  WS Loans ranged from $850 to $10,000. They carried upfront fees, lengthy repayment terms, and annual percentage rates (APRs) ranging from 89.68% to 342.86%. The precise terms evolved over the life of the program and varied based on the amount of the loan.

24.  The following table, copied from Western Sky's website, summarizes recent loan offerings:

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| $10,000 | $9,925 | $75 | 89.68% | 84 | $743.49 |
| $5,075 | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 | $1,000 | $500 | 234.25% | 24 | $198.19 |
| $850 | $500 | $350 | 342.86% | 12 | $150.72 |

25.  The total cost of the WS Loans was substantial. Based on the above table, a consumer borrowing $2,600 would have to pay about $13,840 over a 47-month repayment term – more than five times the amount borrowed. A consumer borrowing

$10,000 would have to pay about $62,453 over an 84-month repayment term – more than six times the amount borrowed.

*Violations of Interest-Rate Caps in Certain Subject States*

26.  The usury laws of the Subject States applied to WS Loans, and the WS Loans made to consumers in those states violated those interest-rate caps. The loans made to consumers in Arkansas, Minnesota, New Hampshire, and New York violated applicable usury restrictions and were thus void. *See* Ark. Const. amend. 89, §§ 3, 6(b) (voiding loans with interest rates above 17%); Minn. Stat. §§ 334.03, 47.601, subdiv. 6(b) (voiding loans that exceed maximum interest rates); N.H. Rev. Stat. §§ 399-A:11(V), 399-A:12(I) (voiding loans with interest rates above 36%); N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a (voiding covered loans with interest rates above 16% made by unlicensed person). Neither Western Sky nor Defendants had a legal right to collect money from consumers in repayment of WS Loans made to consumers in these states.

27.  WS Loans made to consumers in Colorado violated Colorado's interest-rate limits. Those Colorado consumers therefore had no obligation to pay finance charges to Western Sky or Defendants on WS Loans that exceeded the applicable interest-rate limits. *See* Colo. Rev. Stat. § 5-5-201(2) (removing consumers' obligations to pay finance charges that exceed statutory limits to lender or assignee).

*Violations of Licensing Requirements in Certain Subject States*

28. The licensing laws of the Subject States applied to WS Loans, and the WS Loans made to consumers in those states violated those laws. Western Sky, which did not a hold a consumer-lending license in any state, made WS Loans to consumers in Alabama, Arizona, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio, each of which required Western Sky to obtain a license before making WS Loans to their residents.

29. Likewise, neither CashCall nor WS Funding held the requisite license when acquiring WS Loans made to consumers in Massachusetts, Montana, North Carolina, or Colorado.

30. As a result, many WS Loans made to consumers in Alabama, Arizona, Indiana, Illinois, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio were void. Neither Western Sky, nor Defendants, had a legal right to collect money from consumers in those states in repayment of such loans. *See* Ala. Code §§ 5-18-4(a), (d) (rendering void loans of $1,000 or less that are made by unlicensed lenders); Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B) (rendering void loans of $10,000 or less made by unlicensed lenders); 205 ILCS 670/1, 670/20(d) (rendering void consumer-installment loans for principal amounts not exceeding $40,000 made after January 1,

15

2013 by unlicensed lenders); Ind. Code §§ 24-4.5-5-202, 24-4.5-3-502(3) (rendering void consumer loans made by unlicensed lenders); Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1) (rendering void covered loans of $15,000 or less in which the interest rate exceeds 8% a year that are made by unlicensed lenders); Mass. Gen. Laws ch. 140, §§ 96, 110 (rendering void any covered loan of $6,000 or less if interest and expenses on the loan exceeds 12% a year and the loan was made or purchased by an unlicensed entity); Minn. Stat. §§ 47.601, subdiv. 1(d), subdiv. 6(b)(1) (rendering void covered loans of $1,000 or less that are made without a license); Mont. Code Ann. § 32-5-103(1), (4) (rendering void covered loans made, or for which any compensation is contracted for, charged, or received directly or indirectly, by a person without a license); N.H. Rev. Stat. §§ 399-A:1(XIV), 399-A:2(I), (IV) (rendering void loans of $10,000 or less made by unlicensed lenders); N.J. Rev. Stat. §§ 17:11C-2, 17:11C-3, 17-11C-33(b) (rendering void consumer loans of $50,000 or less made by unlicensed lenders); N.M. Stat. Ann. § 58-15-3 (rendering void covered loans of $2,500 or less made by unlicensed lenders); N.Y. Banking Law §§ 340, 355 (rendering void personal loans of $25,000 or less made by unlicensed lenders that charge interest in excess of that permitted); N.C. Gen. Stat. § 53-166(a), (d) (rendering void loans of $15,000 or less made or secured for repayment by unlicensed entities); Ohio Rev. Code Ann. § 1321.02 (rendering void loans of $5,000 or less made without a license).

16

31.  The fact that Western Sky, CashCall, and WS Funding each lacked the requisite license also relieved WS Loan consumers in Colorado of any obligation to pay finance charges to Western Sky or Defendants. *See* Colo. Rev. Stat. §§ 5-5-201(1), 5-2-301(1)(a), (b), 5-1-301(17) (eliminating consumer's obligation to pay lender or assignee finance charges on loan made by unlicensed lender or acquired by unlicensed assignee).

*WS Loan Agreement*

32.  WS Loan consumers, including those in the Subject States, were required to electronically sign a standardized loan agreement. The agreement contained, among other terms:

    a.  a purported obligation "to pay to the order of Western Sky or any subsequent holder of this Note the sum of [amount of the loan proceeds], together with interest calculated at [interest rate] % per annum and any outstanding charges or late fees, until the full amount of this Note is paid;" and

    b.  a purported authorization, or acknowledgement of an alleged prior authorization, for the holder of the note to debit from the consumer's bank account a specified monthly installment amount, which includes principal, interest, and fees.

33. WS Loans were made, serviced, and collected through interstate commerce. Yet the loan agreement asserted that "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America," and that:

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

34. Neither Western Sky nor CashCall is owned or operated by a tribe or tribal entity. WS Loan consumers did not enter tribal lands in applying for, receiving, or paying WS Loans. Rather, consumers applied for and received their WS Loans in the states where they lived. And consumers' payments on WS Loans were taken from bank accounts typically held by consumers in the states where they lived.

## CashCall's and Delbert's Appropriation of Loan Proceeds from Consumers in the Subject States

35. Shortly after WS Funding acquired a WS Loan, CashCall provided notice of the assignment to the consumer by email or letter. This notice generally explained that "[e]ffective today, your loan is now owned by WS Funding, LLC" and that "CashCall was recently assigned your loan for servicing." The notice also informed the consumer that "[g]oing forward, CashCall will handle the servicing of your loan, which means

collecting your payments and handling related issues" and that "you will now be making all of your payments, including your first payment, to CashCall."

36. CashCall then engaged in the full array of collection activity on WS Loans, including those made to consumers in the Subject States:

    a. CashCall sent consumers billing statements that identified the amounts and dates of debits that CashCall would be extracting from the consumers' bank accounts through Automated Clearing House (ACH) transactions;

    b. Beginning on the first payment date and then monthly, CashCall debited the loan payments from the consumers' bank accounts. Interest and other loan fees were typically a substantial part of each installment payment; and

    c. When consumers became delinquent or refused to pay further on the loans, CashCall demanded loan payments through repeated calls, letters, and other communications.

37. CashCall did not disclose to consumers in the Subject States that their loans were void or that, under applicable state laws, they were not obligated to make some or all of the payments.

38. To the contrary, in calls, letters, and other communications, CashCall referred consumers back to their loan agreements with Western Sky, which affirmatively represented that the loans were not subject to any state's law.

39. And, through its billing statements, ACH debits from consumer bank accounts, and dunning letters and other communications, CashCall expressly or impliedly represented that it was legally entitled to demand and receive all principal, interest, fees, and other charges associated with those WS Loans.

40. At least until September 2013, when Western Sky stopped making loans, CashCall continued to extract or at least attempted to extract by ACH debit monthly installment payments from those consumers' bank accounts, which were typically located in the states where the consumers lived. Those efforts ceased only when the consumer fully repaid the loan; the consumer blocked CashCall's access to the account by revoking the ACH authorization or by closing the account; or CashCall assigned or sold the debt to Delbert or another debt collector.

41. Initially, Delbert serviced and collected WS Loans that were delinquent. In 2013, Delbert began servicing non-delinquent WS Loans as well. By early September 2013, CashCall transferred most, if not all, of its remaining WS Loans to Delbert for servicing.

42. Delbert, like CashCall, engaged in the full array of collection activity on WS Loans, including those made to consumers in the Subject States:

a.   Delbert sent billing notices demanding full repayment of the loans;

b.   Delbert extracted, or sought to extract, monthly installment payments, which typically included interest and other loan fees; and

c.   When consumers became delinquent or refused to pay further on the loans, Delbert demanded full payment through repeated letters and other communications.

43.  Delbert did not disclose to consumers in the Subject States that their loans were void or that, under applicable state laws, they were not obligated to make some or all of the payments.

44.  To the contrary, in calls, letters, or other communications, Delbert referred many consumers back to their loan agreements with Western Sky, which affirmatively represented that the loans were not subject to any state's law.

**Substantial Injury Caused by Defendants'**

**Collecting Loan Payments that Consumers Did Not Owe**

45.  Consumers in the Subject States who received WS Loans suffered and continue to suffer substantial financial harm as a result of Defendants' purchase, servicing, and collection of those loans.

46.  Defendants initiated banking orders to extract funds from consumers' bank accounts to pay obligations that under state law were void or that consumers had no obligation to pay in whole or part.

47.  Defendants thus took money from consumers, many of whom were struggling financially, that the consumers did not owe. These consumers suffered significant financial harm as a result.

48.  These consumers, though acting reasonably, could not have avoided financial injury because they were unlikely to know or understand that Defendants' loans violated state-usury and licensing laws, and that such violations vitiated all or part of the loans or the consumers' obligations to repay them. If consumers had known or understood that they were not legally obligated to pay all or part of the loans, many consumers likely would not have authorized Defendants to process debits for the full loan balances, which included substantial interest and fees, or succumbed to Defendants' demands for full payment.

49.  Defendants further prevented consumers from reasonably avoiding the harm by failing to inform consumers that state law had vitiated all or part of the loans or the consumer's obligation to repay them and by misrepresenting that the WS Loans were not subject to state law.

50.  The substantial financial injury caused by Defendants' taking money that they were and are not legally entitled to collect, or that consumers were and are not obligated to pay, is not outweighed by any benefit to consumers or to competition.

## J. Paul Reddam's Role

51.  Reddam is the CEO, president, sole director, and sole owner of CashCall. He has actively managed the activities of CashCall and devised major company policies.

52.  Indeed, in late 2009, in support of license applications for Delbert in at least two states, Reddam represented that he "r[an] the day-to-day operations of CashCall," that "[a]ll of the company's department heads report[ed] directly to [him]," that he was "responsible for devising and implementing all major company policies," and that "[h]e coordinate[d] all marketing and advertising, and determine[d] where advertising should be directed."

53.  Reddam also is the director and sole owner of Delbert, and has been involved in its business and operations. Among other things, in late 2009, Reddam personally signed Delbert's application for a debt-collection license in the Commonwealth of Massachusetts. As part of that application, Reddam agreed on behalf of Delbert to comply with laws pertaining to the debt-collection business. He represented that he, along with one other person, had "principal responsibility for the fulfillment of [Delbert]'s mission and the legal accountability for its operations."

54.  In addition, in support of Delbert's license to engage in debt collection in Massachusetts, in 2009 and again in 2012, Reddam submitted a Biographical Statement & Consent Uniform Debt Collector (DU2) Form in his capacity as a

control person for Delbert. As part of these submissions, Reddam provided and attested to information about his personal finances, his employment history, his business affiliations, his criminal background, and regulatory actions taken against him personally.

55. Reddam played a central role in developing and setting into motion the nationwide scheme through which loans that his companies marketed, financed, purchased, serviced, and collected *purportedly* did not have to comply with state-licensing and usury laws because they were made in the name of Western Sky.

56. In late 2009, Reddam negotiated, and in early 2010 he signed, the agreements between his companies and Western Sky that structured and governed the scheme. Moreover, he is the president, manager, sole member, and sole owner of WS Funding, an entity created to purchase WS Loans from Western Sky.

57. Reddam participated in, or had the authority to control and knew or should have known about, the actions of CashCall, WS Funding, and Delbert described above, including their acts in the Commonwealth of Massachusetts.

## Count One

*Unfairness Related to Collecting Loan Payments that Consumers Did Not Owe*

58. The Bureau realleges and incorporates by reference paragraphs 1-57of this Complaint.

24

59. Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury, which is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition.

60. Defendants have caused and are likely to cause substantial injury which is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition by, as described in paragraphs 35-44, servicing, extracting payments for, and collecting on those WS Loans or portions of WS Loans that laws in the Subject States render void or limit the consumer's obligation to repay.

61. Therefore, Defendants have engaged in "unfair" acts or practices that violate sections 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5536(a)(1)(B), 5531(c)(l).

## Count Two

*Deception Related to Collecting Loan Payments that Consumers Did Not Owe*

62. The Bureau realleges and incorporates by reference paragraphs 1-57 of this Complaint.

63. Section 1036(a)(1)(B) of the CFPA prohibits "deceptive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

64. By sending billing notices and other notices informing consumers that they have acquired collection rights to WS Loans, initiating ACH debits to take payments

from consumers' bank accounts, and demanding payments from consumers in dunning letters and other communications, Defendants have represented, expressly or impliedly, that the entire loan balance was owed to them, that they were legally authorized to collect the associated payments, and that consumers were legally obligated to pay the full amount collected or demanded.

65.  Defendants have failed to disclose that the loans, or some parts thereof, were void or not subject to a repayment obligation under the applicable laws of the Subject States. Those facts would have been material to consumers in the Subject States in deciding whether to pay those portions of the loans that Defendants had no legal right to collect or that the consumers had no obligation to pay.

66.  Defendants' misrepresentations and failure to disclose material information constitute "deceptive" acts or practices that violate sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## Count Three

*Abusiveness Related to Collecting Loan Payments that Consumers Did Not Owe*

67.  The Bureau realleges and incorporates by reference paragraphs 1-57 of this Complaint.

68.  Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it "takes unreasonable

advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A).

69.  Consumers generally do not know or understand the impact that the above-cited usury and licensing laws of the Subject States have on their loans. Consumers who obtained WS Loans in the Subject States, where usury laws or consumer-licensing regimes rendered those loans void, or otherwise limited the consumer's obligation to repay them, typically lacked an understanding that those state laws vitiated Defendants' collection rights on all or part of the consumers' repayment obligations.

70.  By nevertheless taking, or attempting to take, the full loan balance from those consumers, Defendants took unreasonable advantage of consumers' lack of understanding about the impact of applicable state laws on the parties' rights and obligations regarding WS Loans.

71.  Therefore, Defendants have engaged in "abusive" acts or practices that violate sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## Demand for Relief

Wherefore, the Bureau requests that the Court:

1.   permanently enjoin Defendants from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

2.   grant additional injunctive relief as the Court may deem to be just and proper;

3.   award damages and other monetary relief against Defendants;

4.   award restitution against Defendants in the amount of all interest, fees, and principal collected from consumers under consumer-installment loans to the extent that they were void, uncollectible, or not subject to a repayment obligation under state law;

5.   order disgorgement of ill-gotten gains against Defendants;

6.   award civil money penalties against Defendants;

7.   award costs against Defendants; and

8.   award additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Acting Enforcement Director*

Jeffrey Paul Ehrlich (FL Bar #51561)
*Deputy Enforcement Director*

Natalie R. Williams (NY Bar #2422590)
*Assistant Litigation Deputy*

/s/ Lisa Diane Rosenthal
Lisa Diane Rosenthal (CA Bar #179486)
Jesse Silverman (CT Bar #421524)
Crystal Sumner (CA Bar #261435)
Paula Tuffin (NY Bar #2285955)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 633-1326
Facsimile: (415) 844-9788
e-mail: lisa.rosenthal@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the NEF and copies will be

sent electronically to those non-registered participants on March 21, 2014.

<u>/s/ Lisa Diane Rosenthal</u>
Lisa Diane Rosenthal